836 P.2d 968

Luis MENENDEZ, and Michele Menendez, husband and wife; Angela Marie Menendez, a minor, Amanda Elizabeth Menendez, a minor, and Nichole Andrea Menendez, a minor, By and Through Michele Menendez, Guardian Ad Litem, Plaintiffs–Appellants,

v.

PADDOCK POOL CONSTRUCTION CO., an Arizona corporation; Paddock Pool Engineering Corporation, an Arizona corporation; American Continental Corporation, an Ohio corporation; Continental Homes, Inc., an Ohio corporation; Continental Homes, Inc., an Arizona corporation; Continental Homes of Arizona; American Continental Homes, Inc., an Ohio corporation; Larry C. Fischer, Defendants–Appellees.

No. 1 CA–CV 88–296.

Court of Appeals of Arizona, Division 1, Department C.

Dec. 10, 1991.

Review Denied Oct. 6, 1992.

Paul G. Ulrich, P.C. by Paul G. Ulrich and Nancy C. Thompson and Tod F. Schleier, P.C. by Tod F. Schleier and Sheldon J. Schlesinger, P.A. by Sheldon J. Schlesin-

ger, Phoenix, and Robert W. Kelly, Fort Lauderdale, for appellants.

Bonnett, Fairbourn & Friedman, P.C. by William G. Fairbourn, Andrew S. Friedman, Robert J. Spurlock, Phoenix, for appellees Paddock Pool Const. Co. and Paddock Pool Engineering Corp.

Gallagher & Kennedy, P.A. by John E. Lundin, E. Calvin Fuchs, R. Lynne Goggans, Phoenix, for appellees American Continental Corp. and Larry C. Fischer.

## OPINION

TAYLOR, Presiding Judge.

### FACTS

Appellant Luis Menendez was an employee and kitchen training supervisor for TGI Friday's, Inc. (TGIF). On the evening of June 29, 1985, TGIF hosted a private party at the La Casita recreational common area of the Dobson Ranch subdivision in Mesa, Arizona. This facility, which included a large in-ground swimming pool and other amenities, was rented that evening by TGIF from 8:00 p.m. to midnight so that about two hundred of its new employees could celebrate their completion of a two-week company training program.

TGIF furnished beer and wine to the partygoers that night. Further, trainees had been told they could "get crazy" at the party and even throw their training supervisors into the swimming pool. By 9:00 p.m., the effects of alcohol consumption became noticeable. At about 9:30 p.m., after at least four supervisors had been pushed or thrown into the La Casita pool, Luis Menendez was seized by several trainees as he was leaving the party. He was then forcibly carried to the pool and thrown headlong into its shallow end where he sustained spinal injuries resulting in quadriplegia.

Luis Menendez and members of his family (hereinafter individually and collectively

referred to as Menendez) subsequently sued the appellees and others on multiple theories of liability, alleging in part that the design and construction of the La Casita pool proximately caused his injury. This appeal arises only from the dismissal of the strict liability in tort and negligence counts of the complaint.

In May 1987, the trial court granted various joint and individual motions by appellees American Continental Corporation and Continental Homes (hereinafter jointly designated as Continental),[1] Larry C. Fischer (Fischer), and Paddock Pool Construction Co. and Paddock Pool Engineering Corporation (hereinafter jointly designated as Paddock) to dismiss the strict liability in tort counts of the complaint against them. In January 1988, the court granted motions for summary judgment in favor of Continental, Fischer, and Paddock. This resulted in the dismissal of the negligence counts of the complaint against them. Menendez timely appeals both decisions. We consider each in turn.

### DISCUSSION

*Strict Liability in Tort*

The La Casita pool had its origin in 1978 when Continental solicited bids for the design and construction of a custom, non-diving lap pool of specified dimensions. This pool was to be built at its residential development known as Dobson Ranch. Paddock was awarded the contract, which provided that the pool would be custom designed and have a maximum water depth of three feet to four-and-one-half feet. Construction of the pool was completed in 1979. In January 1980, Continental deeded the La Casita recreational property, including the pool, to the Dobson Homeowners' Association. The homeowners' association thereafter managed the facility, renting it regularly to homeowners' groups.

---

1. During the design and initial construction of the pool in 1978, Continental Homes was an Ohio corporation and wholly-owned subsidiary of American Continental Corporation (ACC), also incorporated in Ohio. On January 1, 1979, prior to completion of the pool, Continental Homes merged into ACC as an unincorporated division. At the end of May 1985, Continental Homes, an Arizona corporation unaffiliated with ACC, was formed to acquire certain ACC assets.

In the complaint, Menendez alleged several counts of strict liability in tort against (1) Continental as developer and general contractor for the pool, (2) Fischer as a corporate employee thereof, and (3) Paddock as the pool designer and building subcontractor. In its minute entry granting the motions to dismiss these counts, the trial court ruled that Menendez failed to state a claim upon which relief could be granted. The trial court found that the in-ground pool was not, as a matter of law, a "product" for purposes of strict liability in tort. Noting that such a pool is not manufactured and then introduced into the stream of commerce for sale, the trial court characterized it as a structural improvement to real property rather than as a product incorporated into an improvement to a structure.

Standard of review.

 The standard of review for a grant of a motion to dismiss is to assume the truth of the allegations in the complaint and to uphold the dismissal only if plaintiffs would not be entitled to relief under any facts susceptible of proof in the stated claim. *Mattison v. Johnston*, 152 Ariz. 109, 114, 730 P.2d 286, 291 (App.1986). However, the record comes before us in an unusual posture for such review. The minute entry ruling, which grants the motions to dismiss, hinges on the in-ground character of the pool, a fact not alleged in the complaint but nevertheless presented by appellees to the trial court and relied upon in its ruling.

In his reply brief on appeal, Menendez argues that the standard of review for dismissal precludes our consideration of any such fact not alleged in the complaint. Since Menendez devoted a substantial portion of his opening brief to the issue of whether an in-ground pool is a product, we deem such conduct a waiver of any objection to our consideration of this fact. Moreover, the trial court's reliance on evidence extrinsic to the complaint requires us to treat the granted motions to dismiss as motions for summary judgment. *Pritchard v. State*, 163 Ariz. 427, 433, 788 P.2d 1178, 1184 (1990); Ariz.R.Civ.P. 12(b).[2] On review, therefore, we view the evidence in the light most favorable to the party opposing summary judgment, *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 388, 710 P.2d 1025, 1043 (1985), and will uphold the ruling of the trial court only if there is no genuine issue of material fact, the undisputed material facts support but one inference, and the moving party is entitled to judgment under the substantive law. *Taft v. Ball*, 818 P.2d 158, 161 (App. 1991); Ariz.R.Civ.P. 56(c). However, we only consider evidence that was in the record before the trial court during its summary judgment deliberations. *GM Dev. Corp. v. Community Am. Mortgage Corp.*, 165 Ariz. 1, 4, 795 P.2d 827, 830 (App.1990).

Applicable substantive law.

 A seller engaged in the business of selling a product in a defective condition unreasonably dangerous to the user or consumer is subject to strict liability in tort for physical harm or property damage caused thereby. *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 559, 447 P.2d 248, 251 (1968) (citing Restatement (Second) of Torts § 402A (1965)). To invoke such liability, a plaintiff must make a prima facie showing that a product is defective and unreasonably dangerous, the defect existed at the time it left defendant's control, and the defect is a proximate cause of plaintiff's injury or property loss. *Rocky Mountain*

---

2. Rule 12(b), Arizona Rules of Civil Procedure, states, in relevant part:

> If, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion *shall* be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

(Emphasis added.) Insofar as the applicability of strict liability in tort to an in-ground pool is concerned, our review of the record indicates the parties had reasonable opportunity to present facts pertinent to a summary judgment on this threshold issue. *See Davidson v. All State Materials Co.*, 101 Ariz. 375, 376, 419 P.2d 732, 733 (1966).

*Fire & Casualty Co. v. Biddulph Oldsmobile*, 131 Ariz. 289, 292, 640 P.2d 851, 854 (1982). Moreover, an implicit condition precedent also requires the plaintiff to show that the object or instrumentality claimed to be defective is a "product" as defined either by section 402A of the Restatement (Second) of Torts, legislation, or caselaw. *Brooks v. Eugene Burger Management Corp.*, 215 Cal.App.3d 1611, 1626, 264 Cal.Rptr. 756, 764 (1989); *accord Kaneko v. Hilo Coast Processing*, 65 Haw. 447, 654 P.2d 343, 347 (1982); *Radcliff Homes v. Jackson*, 766 S.W.2d 63, 68 (Ky. Ct.App.1989); *Papp v. Rocky Mountain Oil & Minerals*, 236 Mont. 330, 769 P.2d 1249, 1252 (1989); *Charlton v. Day Island Marina*, 46 Wash.App. 784, 732 P.2d 1008, 1012–13 (1987); James P. Maloney, Comment, *What Is or Is Not a Product Within the Meaning of Section 402A*, 57 Marq. L.Rev. 625, 648 (1974). Whether an object or instrumentality is a "product" is a question of law. *Brooks*, 215 Cal.App.3d at 1626, 264 Cal.Rptr. at 764.

Here, the in-ground nature of the pool is undisputed. Since strict liability in tort can be invoked only if the pool is a product as defined either by the Restatement, legislation, or caselaw, we first review whether the trial court applied the correct substantive law to product characterization. Although strict liability in tort under the *Restatement* has long been recognized in Arizona, *e.g.*, *O.S. Stapley Co.*, 103 Ariz. at

559, 447 P.2d at 251, the question of whether an in-ground swimming pool falls within the definition of a product is an issue of first impression in this state.

Neither the Restatement, Arizona Revised Statutes Annotated ("A.R.S."), nor our caselaw provide a comprehensive definition of product for characterization purposes.[3] The trial court resolved the issue against Menendez by applying a principle of strict liability recited in *Craft v. Wet 'N Wild, Inc.*, 489 So.2d 1221 (Fla.Dist.Ct.App. 1986). This principle states that a structural improvement to realty is not itself subject to strict liability, although manufactured components incorporated into it could be. *Id.* at 1222. The trial court, citing *O.S. Stapley Co.*, 103 Ariz. 556, 447 P.2d 248, and *Wetzel v. Commercial Chair Co.*, 18 Ariz.App. 54, 500 P.2d 314 (1972), reinforced this determination by concluding that an in-ground pool is not manufactured and then introduced into the stream of commerce for sale.

■ Menendez argues on appeal that the principle announced in *Craft* and adopted by the trial court is unreasonably restrictive. This principle, Menendez contends, conflicts with the broad application of strict liability in tort which is inherent in the Restatement and which is reflected in the caselaw of Arizona[4] and other jurisdictions. Menendez also contends that an in-

---

**3.** Although "product" is defined in A.R.S. § 12–681(2) for purposes of Title 12, Chapter 6, Article 9 (Product Liability) as "the individual product or any component part of such product which is the subject of a product liability action," this definition does not address the characterization issue before us.

**4.** In the reply brief, Menendez cites *Salt River Project Agricultural Improvement & Power District Corp. v. Westinghouse Electric Corp.*, 143 Ariz. 368, 694 P.2d 198 (1984); *Scheller v. Wilson Certified Foods*, 114 Ariz. 159, 559 P.2d 1074 (App.1976); *Wetzel*, 18 Ariz.App. 54, 500 P.2d 314; and *Bailey v. Montgomery Ward & Co.*, 6 Ariz.App. 213, 431 P.2d 108 (App.1967), for the rule that in Arizona the implied warranty doctrine is merged into the strict liability in tort doctrine. Menendez therefore alleges that our supreme court effectively extended strict liability to realty when it recognized a builder-vendor's implied warranty to remote homeowners

in *Richards v. Powercraft Homes*, 139 Ariz. 242, 678 P.2d 427 (1984). We find no merit in this argument. All four cases cited for the merger rule involved goods—a computer, smoked pork foodstuff, a chair, and a pogo stick, respectively—with alleged defects that could render them not only merely unfit for their ordinary purposes under implied contract warranty but also unreasonably dangerous. Therefore, their warranty breach claims sounded in tort and were appropriately merged into strict liability in tort. *Richards*, however, involved an implied warranty of workmanship and habitability in the construction of dwellings, which the supreme court subsequently determined in *Woodward v. Chirco Construction Co.*, 141 Ariz. 514, 687 P.2d 1269 (1984), to sound only in contract. Defects in such construction that cause damage to personal property or personal injury are remedied by a *separate* tort claim of negligence, *see id.* at 516, 687 P.2d at 1271, and do not merge the warranty claim into strict liability in tort.

ground pool is manufactured and introduced into the stream of commerce, thus denying any basis for distinguishing otherwise in this case.[5]

Continental, Fischer, and Paddock defend the dismissal, arguing that the policy reasons underlying strict liability limit its application so as to clearly exclude the in-ground La Casita pool. Paddock also argues that since realty was not mentioned under section 402A but was addressed elsewhere in the Restatement, it was not the intent of the Restatement to bring realty within strict liability in tort.

A *per se* rule excluding structural improvements to realty has found support in cases from various jurisdictions. *See Brooks v. Eugene Burger Management Corp.*, 215 Cal.App.3d at 1627, 264 Cal. Rptr. at 765 (apartment complex, playground equipment, and grounds); *Pennington v. Cecil N. Brown Co.*, 187 Ga. App. 621, 371 S.E.2d 106, 107 (Ga.App. 1988) (church parking lot); *Moore v. Jesco, Inc.*, 531 So.2d 815, 817 (Miss.1988) (steel poultry houses); *Scott v. Missouri Inv. Trust*, 753 S.W.2d 73, 74 (Mo.Ct.App.1988) (common stairway of apartment building); *Begay v. Livingston*, 658 P.2d 434, 442 (N.M.1981) (building, parking ramp, and parking space); *Cox v. Shaffer*, 302 A.2d 456, 457 (Pa.Super.1973) (per curiam) (silo). Some courts have reasoned, however, that since the doctrine of strict liability is based upon a defect in a product, injuries arising either from an unsafe design or from a product manufactured by a defendant and incorporated into an improvement to realty may support a strict liability in tort action. *See Philadelphia Nat'l Bank v. Dow Chemical Co.*, 605 F.Supp. 60, 62–63 (E.D.Pa.1985) (incorporation of manufacturer's mortar additive in commercial bank building); *Hyman v. Gordon*, 35 Cal. App.3d 769, 773, 111 Cal.Rptr. 262, 264–65 (1973) (installation of water heater in dangerous location); *Duggan v. Hallmark Pool Mfg. Co.*, 398 N.W.2d 175, 178 (Iowa 1986) (design and manufacture of prefabricated swimming pool); *Patitucci v. Drelich*, 153 N.J.Super. 177, 379 A.2d 297, 299 (1977) (installation of inadequate sewage disposal system); *DeCrosta v. A. Reynolds Constr. & Supply Corp.*, 49 A.D.2d 476, 478, 375 N.Y.S.2d 655, 657 (1975) (defects in construction of in-ground swimming pool) (dictum); *see generally* Annotation, *Recovery, Under Strict Liability in Tort, for Injury or Damage Caused by Defects in Building or Land*, 25 A.L.R. 4th 351 (1983).

Moreover, numerous cases in other jurisdictions have excluded specific structures as well as improvements to realty after weighing the policy considerations for imposing strict liability in tort. *See McClanahan v. American Gilsonite Co.*, 494 F.Supp. 1334, 1348 (D.Colo.1980) (applying Colorado law) (crude oil refinery); *Wright v. Creative Corp.*, 30 Colo.App. 575, 498 P.2d 1179, 1182–83 (1972) (residential house); *Easterday v. Masiello*, 518 So.2d 260, 261 (Fla.1988) (jail); *Messier v. Association of Apartment Owners*, 6 Haw.App. 525, 735 P.2d 939, 946–47 (1987) (condominium apartment building); *Lowrie v. City of Evanston*, 50 Ill.App.3d 376, 8 Ill.Dec. 537, 542–43, 365 N.E.2d 923, 928–29 (1977), (multi-level open air parking garage and parking spaces therein); *Chubb Group of Ins. Cos. v. C.F. Murphy & Assocs.*, 656 S.W.2d 766, 779–80 (Mo.Ct.App.1983) (enclosed public arena); *Papp v. Rocky Mountain Oil & Minerals*, 236 Mont. 330, 769 P.2d 1249, 1255–56 (1989) (petroleum separator facility); *Jackson v. Franklin*, 51 Ohio App.3d 51, 554 N.E.2d 932 (1988) (custom-designed public swimming pool). Some courts have found strict liability in tort applicable to specific realty improvements after taking into account the policy considerations underlying the doctrine. *See Bednarski v. Hideout Homes & Realty*, 711 F.Supp. 823, 825–27 (M.D.Pa.1989)

---

5. In the reply brief, Menendez argues for the first time on appeal that because the La Casita pool was described as a product in the printed boilerplate of the contract executed between Continental and Paddock, appellees thereby admitted to product characterization for strict liability purposes and waived any claim to the contrary. Since this argument was not raised in Menendez's opening brief or appellants' answering brief, Menendez is precluded from raising it on reply, and we do not consider it. *Industrial Indem. Co. v. Goettl*, 138 Ariz. 315, 319 n. 1, 674 P.2d 869, 873 n. 1 (App.1983).

(applying Pennsylvania law) (defective electrical outlet in residential house); *Bastian v. Wausau Homes,* 620 F.Supp. 947, 949–50 (N.D.Ill.1985) (applying Illinois law) (defective electric baseboard heater in prefabricated factory-built home); *Kaneko v. Hilo Coast Processing,* 65 Haw. 447, 654 P.2d 343, 350 (1982) (prefabricated steel mill building); *see generally* Edie Lindsay, *Strict Liability and the Building Industry,* 33 Emory L.J. 175, 191–210 (1984).

For the reasons explained below, we do not deem it necessary to assess the validity of the *per se* rule adopted by the trial court in which it characterized an in-ground pool as a structural improvement and therefore not a product. Rather, we examine the policy reasons underlying the strict liability doctrine to see if it should be applied to this case. By this approach, we do not base our decision upon the intent of the drafters of the Restatement, as indicated by the absence of buildings and land from section 402A and from the fact that real property is expressly addressed elsewhere in the Restatement.[6] *See Lowrie,* 8 Ill.Dec. at 544, 365 N.E.2d at 929 (drafters' intent considered with policy analysis); *Chubb,* 656 S.W.2d at 779 (drafters' intent not dispositive). *But see Cox,* 302 A.2d at 457 (drafters' intent dispositive).

■ Since strict liability in tort is imposed by law for reasons of public policy, *Caruth v. Mariani,* 11 Ariz.App. 188, 190, 463 P.2d 83, 85 (1970), public policy reasons are appropriate factors for case-by-case determination whether a structure is a product within this doctrine. *Kaneko,* 654 P.2d at 349; *Trent v. Brasch Mfg. Co.,* 132 Ill.App.3d 586, 87 Ill.Dec. 784, 786–89, 477 N.E.2d 1312, 1314–17 (1985); *Papp,* 236 Mont. at 335–39, 769 P.2d at 1253–55; Maloney, *supra; cf. Lechuga, Inc. v. Montgomery,* 12 Ariz.App. 32, 37–38, 467 P.2d 256, 261–62 (1970) (Jacobson, J., concurring) (public policy reasons should determine if strict liability in tort applies to chattel lessors).

■ Strict liability in tort was not adopted by the courts simply because something was a product or resulted from production. *Lowrie,* 8 Ill.Dec. at 542, 365 N.E.2d at 928. Rather, public policy reasons brought it into being and continue to expand it. It is those reasons, therefore, that should determine what is a product. *Id.* Under that analysis, we characterize an object or instrumentality as a product only if such classification serves the policy considerations of the strict liability in tort doctrine. One authority has identified three main policy reasons driving the development of strict liability in tort:

(1) the costs to the victims of accidents attributable to defectively dangerous products can and should be distributed through the market mechanism by first charging those costs to sellers and manufacturers of the product who, in turn, will pass those costs on to purchasers; [7] (2) the imposition of strict liability will serve the cause of accident prevention by

**6.** In the Restatement (Second) of Torts, Chapter 13 is titled "Liability for Condition and Use of Land". Topic 2 of this chapter defines "Liability of Vendors and Other Transferors of Land to Persons on the Land." In particular, § 352 addresses "Dangerous Conditions Existing at Time Vendor Transfers Possession," and § 353 addresses "Undisclosed Dangerous Conditions Known to Vendor." Moreover, under Topic 8, "Liability of Persons Other Than a Possessor, Vendor, or Lessor," § 385 deals with "Persons Creating Artificial Conditions on Land on Behalf of Possessor; Physical Harm Caused After Work has been Accepted."

In contrast, § 402A is found under Chapter 14, "Liability of Persons Supplying Chattels for the Use of Others" and was "inserted in the Chapter dealing with the negligence liability of suppliers of chattels, for convenience of reference and comparison with other Sections dealing with negligence." Restatement (Second) of Torts § 402A cmt. a (1965).

**7.** The Restatement provides:

[P]ublic policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement (Second) of Torts § 402A cmt. c (1965); *see also Westinghouse Elec. Corp.,* 143 Ariz. at 375, 694 P.2d at 205; Maloney, *supra,* at 627.

inducing improvements in products and in the information provided about those products;[8] and (3) the burden of proving fault or negligence, which is often present in defective product situations, is too difficult and expensive where the manufacturing process is not open to public view and, in many cases, not readily understandable without expert testimony.

Roger C. Henderson, *Strict Products Liabilty and Design Defects in Arizona*, 26 Ariz.L.Rev. 261, 261–62 (1984) (footnotes omitted);[9] *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 98, at 692–93 (5th ed. 1984). These three reasons can be summarized respectively as cost-shifting, public safety, and recovery policies.

This court focused on the burden of recovery as a policy justification when we declared that the strict liability in tort doctrine was adopted to correct the respective deficiencies of warranty and ordinary negligence—the privity requirement and the difficulty in proving lack of due care. *Brady v. Melody Homes Mfr.*, 121 Ariz. 253, 258, 589 P.2d 896, 901 (App.1978), *disapproved in part on other grounds, Dart v. Wiebe Mfg.*, 147 Ariz. 242, 709 P.2d 876 (1985). Given the inherent character of product defects rooted in the manufacturing process, the judicial response was to redress "the unavailability of an adequate remedy on behalf of the injured plaintiff." *Lechuga*, 12 Ariz.App. at 38, 467 P.2d at 262 (Jacobson, J., concurring); *see also McClanahan*, 494 F.Supp. at 1348 (" '[T]he predominant problem with effectuating recovery for injuries caused by a chattel is the difficulty of finding the negligent party and effecting a recovery from that party.' ") (citing *Wright v. Creative Corp.*, 30 Colo.App. 575, 498 P.2d 1179, 1182 (1972); *Harrington v. LaBelle's of Colorado*, 235

Mont. 80, 765 P.2d 732, 735 (1988) ("A major goal of [strict liability is] to afford the plaintiff a remedy...."); *Jackson*, 554 N.E.2d at 940 ("The first justification [for applying strict liability to manufacturers] is the difficult burden of proof that a consumer of mass-produced items would bear in a negligence action.").

With these views of the policy reasons for imposing strict liability in tort, we examine their applicability to the in-ground pool at issue, with special emphasis on the adequacy of a remedy. Citing the reasoning in *Lowrie*, 8 Ill.Dec. 537, 365 N.E.2d 923, and *Heller v. Cadral Corp.*, 84 Ill. App.3d 677, 40 Ill.Dec. 387, 406 N.E.2d 88 (1980), appellees argue that strict liability is not justified. Menendez, appellees contend, had an adequate remedy through the negligence counts brought against them and others in this action with no difficulty of access to a remote manufacturer. Indeed, Continental and Fischer note in this regard, and Menendez admits, that prior to this appeal, Dobson Homeowners' Association, originally named as a co-defendant and identified as the pool landowner, had settled Menendez's negligence and gross negligence claims.

The remedy analysis found in both *Lowrie* and *Heller* has also swayed courts in other jurisdictions against the imposition of strict liability. *See Harrington*, 765 P.2d at 735; *Jackson*, 554 N.E.2d at 940; *Wright*, 498 P.2d at 1182–83. Although we decline to make recovery alone dispositive of strict liability, we are persuaded at least that the nature of the La Casita pool as a realty improvement did not inherently foreclose Menendez from a negligence remedy by virtue of an insuperable burden of proof.

---

8. The Restatement states:

The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods.

Restatement (Second) of Torts § 402A cmt. f (1965); *see also Westinghouse Elec. Corp.*, 143 Ariz. at 375–76, 694 P.2d at 205–06.

9. For a comprehensive enumeration of public policy reasons for strict liability in tort, see *Lechuga*, 12 Ariz.App. at 37–38, 467 P.2d at 261–62 (Jacobson, J., concurring); *see also Bastian*, 620 F.Supp. at 949–50.

Claiming that the La Casita pool was custom-built, appellees also argue against shifting the injury cost to them because unique projects limit a builder's ability to absorb and spread the cost of risk through mass-production volume. If risk is to be shifted, appellees contend that the landowners are in the best position to control the use of a realty improvement, to discover defects and assess risks arising from its use, and to procure appropriate insurance for protection. In reply, Menendez responds that cost-shifting against the corporate appellees is warranted because they are "large companies which produce large numbers of similiar products."

The cost-shifting arguments advanced by appellees find support from several commentators. *See Lindsay, supra,* at 197–201; Maloney, *supra,* at 635. Such arguments are grounded on the uniqueness of a constructed structure. These arguments, however, lose their force when the structure at issue is created in a mass-production context. *See Lindsay, supra,* at 199–200, 209; *see also Jackson,* 554 N.E.2d at 940.

In the landmark case of *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314 (1965), the New Jersey Supreme Court held that a builder-vendor of mass-produced tract homes could be found strictly liable for injuries resulting from a defect in a water distribution system design which allowed excessively hot water into a bathroom faucet. The builder was a mass developer of planned communities and marketed residential homes through advertised models constructed with standardized specifications. *Id.* 207 A.2d at 316. The court found "that there [were] no meaningful distinctions between Levitt's mass produc-

tion and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations [were] the same." *Id.* at 325.

If there is improper construction such as a defective heating system or a defective ceiling, stairway and the like, the wellbeing of the vendee and others is seriously endangered and serious injury is foreseeable. The public interest dictates that if such injury does result from the defective construction, its cost should be borne by the responsible developer who created the danger and who is in the better economic position to bear the loss rather than by the injured party who justifiably relied on the developer's skill and implied representation.

*Id.* at 326. This same reasoning was adopted by a California appellate court. In *Kriegler v. Eichler Homes,* 269 Cal.App.2d 224, 74 Cal.Rptr. 749 (1969), the court extended strict liability in tort to a builder of mass-produced tract homes for economic damages resulting from a defectively installed radiant heating system.[10] *See also Oliver v. Superior Court,* 211 Cal.App.3d 86, 259 Cal.Rptr. 160, 162 (1989); Model Uniform Product Liability Act, § 102(A)(1), (F), 44 Fed.Reg. 62,714, 62,717–19 (1979) (builder-vendor strictly liable only if it is a mass producer and seller of standardized dwellings, including modular homes). Therefore, even if we were to adopt the reasoning of *Schipper,* cost-shifting can be justified in this case only if the pool at issue was a mass-produced rather than a unique structure. Finally, appellees argue against the public safety justification. Appellees assert that the construction process for structures such as this pool limits the ability of the builder to eliminate or minimize design defects by means of the test-

10. Other California cases later extended strict liability to defendants who were characterized as mass producers, developers, and sellers/lessors of real property developments. None of these cases, though, expressly relied on the *Schipper* cost-shifting analysis. *E.g., Del Mar Beach Club Owners Ass'n v. Imperial Contracting Co.,* 123 Cal.App.3d 898, 176 Cal.Rptr. 886 (1981). Although the more recent case of *La Jolla Village Homeowners' Ass'n v. Superior Court,* 212 Cal.App.3d 1131, 261 Cal.Rptr. 146 (1989), acknowledged cost-shifting as "the fun-

damental policy underlying the doctrine of strict liability," the appellate court declined to extend the doctrine to subcontractors hired by the developer of a multi-unit residential condominium project. *Id.* at 1144, 261 Cal.Rptr. at 151. The court held that "a plaintiff is already protected because the developer is strictly liable for the negligence of its subcontractors and the developer has adequate recourse to proceed against the subcontractors if warranted in any particular case." *Id.*

ing, refinement, and quality-control procedures compatible with mass production. Because we find the evidence supports the contention of appellees that this pool was individually designed and custom built, this argument is persuasive. Appellee Paddock further contends that public safety is already protected by governmental regulation of the construction process through builder licensing, mandatory building codes, and project permit requirements, including plan review and site inspection approvals. We also find merit in this latter argument.

■ We conclude from this review that policy reasons do not justify characterizing the La Casita pool as a product for purposes of strict liability in tort. The La Casita pool has not been shown to be a standardized model constructed, assembled, or manufactured by a mass-production process analogous to the tract homes in *Schipper* and *Kriegler*. In addition, it has not been shown to be analogous to the prefabricated fiberglass pool designed, manufactured, and distributed for installation by the defendant in *Duggan*, 398 N.W.2d 175.

### Premises Liability/Negligence Issues

Menendez alleged that all the appellees were negligent in the design and construction of a pool that was "dangerously shallow[,] ... a hazard[,] and a trap;" was improperly lighted and had insufficient depth markers and warning signs; and did not comply with sound engineering principles, good construction practices, or the minimum requirements of local health and building codes. Further, other additional but related negligent conduct was specifically alleged against the individual appellees. The trial court, however, granted summary judgment in favor of appellees on all negligence counts. The court's order of dismissal was based on different grounds for Paddock than for Continental and

Fischer. We therefore review the grounds separately.

Vendor nonliability.

■ In its minute entry ruling granting summary judgment in favor of Continental and Fischer on the negligence counts alleged against them, the trial court found them nonliable under section 352 of the Restatement (Second) of Torts. Section 352 provides:

Except as stated in § 353, a vendor of land is not subject to liability for physical harm caused to his vendee *or others* while upon the land after the vendee has taken possession by any dangerous condition, whether natural *or artificial,* which existed at the time that the vendee took possession.

Restatement (Second) of Torts § 352 (1965) (emphasis added). Section 353, which refers to undisclosed dangerous conditions known to the vendor, creates an exception to this nonliability rule. It states:

(1) A vendor of land who conceals or fails to disclose[11] to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition or the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

*Id.* at § 353(1). We first address the applicability of section 352 apart from its exception.

It is undisputed that as developer of the Dobson Ranch subdivision, Continental was

---

11. Mere failure to disclose is distinguished from concealment under this exception for purposes of defining the conditions under which vendor liability subsequently ceases. A vendor actively conceals a condition "either by hiding it or by misleading the vendee into a failure to discover it." Restatement (Second) of Torts, § 353, cmt. g (1965); *see also id.* at cmt. d. In this appeal, Menendez apparently asserts vendor failure to disclose rather than concealment.

the owner-builder of the La Casita recreational facility during the design and original construction of the pool by subcontractor Paddock. It is also undisputed that the constructed pool was inspected and approved for use by county health officials before Continental both conveyed title of the La Casita facility to the Dobson Homeowners' Association in January 1980 and subsequently relinquished control over the incorporated association five months later. Between that time period and Menendez's injury over five years later, the homeowners' association was both landowner and operator of the pool and facility. We conclude therefore that the homeowners' association was clearly a vendee in possession of the land at the time of Menendez's injury and that Continental was the vendor within the meaning of section 352.[12]

Menendez contends on appeal that the trial court erred because section 352 is inapplicable to a vendor who creates a dangerous condition. This court, though, has held otherwise. *See Andrews v. Casagrande*, 167 Ariz. 71, 804 P.2d 800 (App. 1990). In *Andrews*, the prior owner-vendors of a house with an above-ground swimming pool, which was installed by them, were sued by the lessees of the buyer after their child nearly drowned in the pool. The plaintiff asserted that the four foot deep pool was dangerous because its partly buried walls created the appearance of safety without actually preventing a child from climbing over. This court concluded that the pool was an artificially dangerous condition within the meaning of section 352, albeit obvious and unconcealed. We then applied section 352 to affirm nonli-

ability, even though the vendors themselves created the condition. Our precedent clearly forecloses the argument advanced by Menendez.

The holding in *Andrews*, which applied section 352 nonliability, was expressly limited to homeowner-vendors. *Id.* at 75, 804 P.2d at 804. We find no basis in the Restatement nor any compelling policy reason to deny its extension in this case to the commercial builder-vendor of a recreational facility with a pool. *See Cothrun v. Schwartz*, 156 Ariz. 459, 752 P.2d 1045 (App.1988) (barring liability of vendor of trailer park under section 352).

■ In its minute entry granting summary judgment, the trial court found section 353, the exception to section 352 nonliability, inapplicable to the pool transfer. The court found that "[a]ny alleged 'dangerous condition' was open and obvious or was readily discoverable" and that no facts were presented to establish that Continental or Fischer concealed or failed to disclose any such condition to the vendee. The court therefore hinged its decision not on whether a dangerous condition existed but on the section 353(a) requirement that a vendee not have reason to know of the condition or risk involved[13] and on the evidence of nondisclosure by the vendor. We note that even when evidence shows failure to disclose, section 353 applies only so long as the vendee is both unaware and without reason to know of the condition or risk.[14]

■ Menendez argues that the trial court erred by not applying section 353 because material issues of fact exist regarding whether there was a dangerous

---

**12.** The deed shows a consideration of "Ten and 00/100 Dollars, and other valuable consideration." Moreover, § 352 applies "to any former owner of land whose ownership and possession have been transferred otherwise than by sale." Restatement (Second) of Torts § 354(1) (1965). This includes any transfer, "whether by gift, disseisin, taking by the state under eminent domain, succession, or otherwise." *Id.* at cmt. a.

**13.** In the context of this case, "reason to know" means that the vendee, as actor, "has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or

that such person would govern his conduct upon the assumption that such fact exists." Restatement (Second) of Torts § 12(1) (1965). However, it implies no duty of knowledge on the part of the actor. *Id.* at cmt. g.

**14.** Absent active concealment, § 353(2) continues vendor liability only until the vendee has had reasonable opportunity to discover the condition and take effective precautions against it. Sufficient opportunity is determined by the length of time elapsed, the nature of the condition, and the use made by the vendee of the land. *Id.* § 353 cmt. g.

latent condition and whether the vendee was actually aware of it. As to the condition, Menendez claims that it was a hidden hazard created by the combination of overall shallow water depth with insufficient warning signs and depth markers. Menendez argues that the vendee, Dobson Homeowners' Association, was aware of the shallow depth and danger of diving but denies that the vendee knew about the signs and markers. Menendez thus contends that the vendee was unaware of the *combined* hazard. The only evidence before the trial court that directly supported this hidden danger theory was an affidavit of Menendez's witness, engineer Gaston Lawrence Raffaelli. Raffaelli stated that, in his opinion, the absence of a "deep end" in the pool, together with insufficient signs and markers, created a dangerous condition that would be obvious only to skilled pool designers and builders but not the average person lacking special training or experience. He further declared that this condition was a direct cause of Menendez's injury, which would probably have been prevented by adequate markers and signs.

 It is undisputed that the pool was designed and built with a slanted bottom, creating a maximum water depth of four or more feet in the deepest portion and three feet or less at its most shallow end. It is also undisputed that Menendez sustained his injury when he was thrown into the shallow end. We think we can safely take judicial notice of the fact that swimming pools in Arizona commonly have shallow ends. Further, Menendez neither argues nor has presented any evidence that a shallow end of this depth *per se* creates an unreasonable risk within the meaning of section 353(1) of the *Restatement.* Instead, the hazardous condition described in Raffaelli's affidavit is an indivisible combi-

nation of a too-shallow *deeper portion* with inadequate markers and signs.[15] If Menendez was injured by plunging into a deep end with insufficient water depth, this hazard might directly relate to the injury. Yet, the affidavit neither shows nor allows reasonable inferences that the alleged condition either created an unreasonable risk of danger in the most shallow end of the pool or caused Menendez's injury, notwithstanding its causation opinion. We allow an expert witness much greater latitude than a lay witness in voicing opinions in summary judgment affidavits. *Continental Bank v. Wa–Ho Truck Brokerage,* 122 Ariz. 414, 418, 595 P.2d 206, 210 (App. 1979). Raffaelli's affidavit, however, fails to provide any reasonable linkage between the condition alleged and the injury at its shallow end.

Given the injury location, it is immaterial whether the water depth at the opposite end should have been greater than it was. Speculation that some slight doubt, scintilla of evidence, or dispute over irrelevant or immaterial facts might blossom into a real controversy at trial is insufficient to forestall summary judgment. *Orme School v. Reeves,* 166 Ariz. 301, 311, 802 P.2d 1000, 1010 (1990). We find Raffaelli's causation opinion to be wholly conclusory in substance and inconsistent with the alleged condition as described in his affidavit. Raffaelli's affidavit, therefore, is insufficient as evidence to create a genuine issue of material fact under section 353(1) of the Restatement, regarding whether a condition involving an unreasonable risk caused physical harm to Menendez. *See id.* at 309, 802 P.2d at 1008. *Compare Andrews,* 167 Ariz. at 75–76, 804 P.2d at 804–05 (affidavit of aquatic safety expert insufficient under section 353 to block summary judgment against pool injury plaintiff) *with Dietrich*

---

**15.** Raffeilli's affidavit states, in relevant part:
In my opinion ... the swimming pool ... was intrinsically dangerous and involved an unreasonable risk of harm to users of the facility. The pool as designed and constructed is a very shallow swimming pool of unusual design for adult swimmers. *The pool does not have a deep end,* and therefore is not of the usual configuration normally expected by the average swimmer. The depth markers for the deck required for safety purposes ... were not present, and the depth markers present on the walls of the pool are inaccurate and misleading. No signs were posted warning that the swimming pool was abnormally shallow, nor were signs posted warning that the pool could only be used for lap swimming and exercise.
(Emphasis added.)

*v. Allstate Ins. Co.,* 540 So.2d 358, 361 n. 3 (La.Ct.App.1989) (summary judgment affidavit of diving injury expert fundamentally defective).

We think this evidentiary failure is dispositive of the exception issue. Therefore, we do not reach the other arguments raised by Menendez. Although the trial court enunciated different grounds for granting judgment, we find no conflict insofar as its minute entry was inconclusive regarding whether an unreasonably dangerous condition existed. Summary judgment in favor of Continental and Fischer on the negligence counts is affirmed.

Contractor nonliability.

■■■ In granting summary judgment in favor of Paddock on the negligence allegations, the trial court recognized a different nonliability defense under the accepted work doctrine of *Shannon v. Butler Homes,* 102 Ariz. 312, 428 P.2d 990 (1967). In *Shannon,* the court held that a contractor is not liable in tort to third persons for injuries suffered after completion and acceptance of the work by the owner. *Id.* at 315, 428 P.2d at 993. The contractor, however, remains liable "where the work is inherently, intrinsically or abnormally dangerous, or so manifestly defective as to be imminently dangerous to third persons," and such "danger was not discovered or obvious to the owner." *Id.* (citations omitted). In its minute entry ruling, the trial court expressly found that the above exceptions to nonliability were inapplicable. The court declared that "[a] shallow end of a swimming pool, which by definition is 2½' to 3' deep, does not constitute work that is 'inherently, intrinsically or abnormally dangerous, or so manifestly defective as to be imminently dangerous to third persons.'"

■■■ The work acceptance rule, however, was substantially modified eight years after *Shannon* was decided. Our supreme court restricted application of the defense exclusively to situations in which the contractor has no discretion and merely follows the plans and specifications provided by its employer. *See L.H. Bell & Assocs. v. Granger,* 112 Ariz. 440, 445, 543 P.2d 428, 433 (1975); *Porras v. Campbell*

*Sales Co.,* 121 Ariz. 320, 322, 589 P.2d 1352, 1354 (App.1978). If the contractor is hired to exercise its discretion, special skills, and knowledge to prepare a design, and the owner does not control the design details, the contractor cannot invoke the rule. *Bell,* 112 Ariz. at 446, 543 P.2d at 434. Rather, standard negligence principles would apply. *Porras,* 121 Ariz. at 322, 589 P.2d at 1354. The effect of *Bell,* therefore, was to replace the exceptions to nonliability set forth in *Shannon* with the standard of reasonable care under the circumstances and to constrict nonliability under the work acceptance defense to "no discretion" work only.

Menendez suggests that the supreme court has abolished the accepted work doctrine by extending the implied warranty of workmanship and habitability to remote homeowners. *See Richards v. Powercraft Homes,* 139 Ariz. 242, 678 P.2d 427 (1984). We disagree. *Richards* and its progeny expanded implied warranty liability for the homebuilder-vendor but failed to address nonowner subcontractors like Paddock. Moreover, such liability was only widened to include subsequent homeowners, not nonowner third persons such as Menendez or nonresidential realty improvements like the La Casita recreational area pool. We find no overall displacement of the accepted work doctrine by *Richards.*

Although we apply a later version of the work acceptance rule than did the trial court, we can affirm if we agree with the court's ultimate ruling. *State v. Perez,* 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984). To affirm nonliability for Paddock on this record, there must be no genuine issue of material fact or contrary reasonable inference from the undisputed facts that Continental accepted the work performed by Paddock and that Paddock only followed the specific instructions of Continental. Menendez contends that the work acceptance doctrine under *Porras* is unavailable to Paddock if any discretion was exercised in the performance of work under the Continental contract. Accepting this as a correct statement of the law, we focus on whether Paddock exercised any discretion in the performance of the specific negligent acts alleged against it, and if so, did the

exercise of that discretion contribute to Menendez's injury.

The record does not disclose the extent of detail given Paddock when it was requested to design the pool. It is undisputed, however, that through Fischer, Continental as owner and general contractor solicited a bid from Paddock for the design and construction of a shallow non-diving swimming pool having maximum water depths of three feet to four-and-one-half feet. Paddock submitted a bid dated February 15, 1978, and Continental signed a contract the following month committing Paddock to perform plan preparation and construction services for the proposed pool. After plan review and approval by the Maricopa County Health Department, construction was undertaken by Paddock and completed in May 1979. In addition, there was some warranty repair performed in the spring of 1980. It is undisputed that Continental accepted the design, original construction, and warranty repair work performed by Paddock. In October 1979, the pool was inspected by the county health department and approved for operation as a non-diving, special use, semi-public swimming pool.

The specific negligent acts alleged against Paddock were the design and construction of the pool. Menendez asserts the same defects to compose a hazardous condition for purposes of vendor liability, (i.e., a dangerously shallow pool without sufficient pool depth markers or warning signs limiting use to non-diving lap swimming and exercise).[16] Menendez also relies on Raffaelli's affidavit as evidentiary support for these defects.

It is undisputed that Continental prescribed a non-diving pool when it solicited a bid from Paddock. Paddock's bid estimate and follow-up contract fixed the pool depth

to not exceed four-and-one-half feet. Menendez neither argued to the trial court nor does he assert on appeal that Paddock was authorized to design a pool of diving depth, or that it was granted any discretion in the critical area of depth design. Discretion in other design features is of no significance to Menendez's claim.

Additionally, as noted previously, Menendez does not claim that a shallow end with a water depth of three feet or less is *per se* defective. Since Raffaelli's affidavit isolated the lack of a "deep end" as the depth defect, the issue narrows further to discretion over the maximum water depth in the deepest end. Because we previously concluded that Raffaelli's affidavit could not reasonably establish causation for Menendez's injury in the shallow end, further discussion of depth design discretion under *Bell* is unnecessary. The evidence for this specific alleged negligence cannot serve to create liability in Paddock for the injury at issue.

The water depth markers were alleged to be defective because the vertical wall markers were inaccurate and the horizontal deck surface markers were missing. The only evidence regarding vertical markers presented to the trial court was a simple statement in Raffaelli's affidavit that the markers were "inaccurate and misleading." No specific reasons or basis were given for such conclusions. Absent any reasons for this opinion, we find it wholly conclusory and insufficient as evidence to raise a genuine issue of material fact.

As to the missing deck surface depth markers, the record reveals that Menendez conceded that the pool design plans prepared by Paddock were altered prior to county health department construction approval to include such markers. We therefore find no evidence of Paddock's design

---

16. Menendez also alleged improper lighting and claimed that the pool was not built to conform with the approved plans. The only evidence offered to the trial court concerning the construction deviation was a parenthetical reference in Menendez's statement of facts in opposition to the Dobson Homeowners' Association's summary judgment motion, citing to the "Depo. of Stadler and Shaffer, and swimming pool survey attached thereto." Since Menendez failed to quote from these depositions, attach copies of

the portions referenced, or present or file the deposition transcripts with the court prior to its decision, we find such a reference insufficient as evidence to create a genuine issue of material fact on this matter. *See GM Dev. Corp. v. Community Am. Mortgage Corp.*, 165 Ariz. at 1, 6, 795 P.2d 827, 832 (App.1990). Since no evidence was even presented to the trial court in support of the lighting allegation, we deem it to be waived.

negligence in this regard. The record also reveals that Paddock was not responsible under the contract for construction of the pool deck containing the markers. Rather, the pool deck was built by another subcontractor with whom Continental contracted independently. Moreover, Paddock presented uncontroverted deposition evidence showing that the other subcontractor undertook the marker installation. We find no evidence of negligent deck marker installation by Paddock.

As to the sign defects, since both the bid estimate and contract specified that Paddock was to provide but one "Pool Rule" sign of the "No Life Guard on Duty" type and because Menendez has presented no evidence that Paddock was exclusively required to furnish all pool signs, we conclude that Paddock had no contractual discretion to provide all additional signs that might be required. Our conclusion finds further support in the undisputed fact that Continental, as both owner and general contractor, itself handled such aspects of pool construction as the decking, fencing, and exterior lighting. In addition, warning signs besides those described in the Paddock contract were in fact installed at the pool gate.

We therefore conclude that no genuine issue of material fact bars Paddock from invoking the accepted work doctrine under *Bell* and *Porras*[17] and further, that Menendez has not presented evidence connecting his injury to any alleged design defect in the pool's shallow end. The trial court properly granted summary judgment in favor of Paddock.

## CONCLUSION

For the above reasons, the judgments of the trial court are affirmed.

KLEINSCHMIDT and EUBANK, JJ., concur.

---

17. Since we affirm on this issue, we need not reach the superseding proximate cause theory raised in the trial court and on appeal by Pad-

dock as independent grounds for summary judgment.